**FILED**
**Jun 25, 2024, 10:37 AM**
**in the Clerk's Office**
**U.S. District Court,**
**EDNY, Brooklyn**
**Pro Se Office via**
**Box.com**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------X
SHAWN RANDALL THOMAS,

                        Plaintiff,

-v-

CITY OF NEW YORK;
ERIC LEROY ADAM;
KEECHANT SEWELL;
JAMES DHANPATH [960454];
JOLEANN A BREWSTERCOLLIAR [973059];
DAVID A RICHTER [964724];
WILLIAM J WALTON [973027];
SU QU [973142];

                     Defendants.
--------------------------------------------------------X

1:24-cv-01562

AMENDED COMPLAINT

**JURY TRIAL DEMANDED**

Plaintiff, SHAWN RANDALL THOMAS, brings this claim complaining of the

defendants, respectfully alleges as follows:

### NATURE OF ACTION

1.    This action is brought by Shawn Randall Thomas, sui juris, hereinafter Plaintiff, to

recover damages for the Defendants' violations of Plaintiff's rights in or about August

10th, 2022, rights which are protected by the constitution; and to collect a debt for value

received.

### THE PARTIES

2.    Plaintiff, a non-resident; non-domicile; sentient being, has operated as a photo-journalist

primarily in the New York City area for approximately twenty years.

3.      Defendants Police Officer James Dhanpath; Police Officer Joleann A Brewstercolliar; Police Officer David A Richter; Police Officer William J Walton; and Police Officer Su Qu are employees of the City of New York Police Department, as referred to herein as the "Individual Defendants."

4.      Defendant City of New York, hereinafter "Defendant City", is a [municipal] domestic corporation which operates as a governmental corporate entity within the lower five counties of New York state, i.e., New York City.

5.      Defendant Eric Leroy Adams is the chief executive officer ("CEO") of the corporation "City of New York"

6.      Defendant Keechant Sewell was the Commissioner of the corporation "City of New York" police department on August 10th, 2022.

## JURISDICTION AND VENUE

7.      Jurisdiction is proper in this district under 28 U.S.C. § 1331 in that this action arises under the Constitution and laws of the United States, among them 42 U.S.C. § 1983.

8.      Venue is proper in this district under 28 U.S.C. § 1391(c) in that the events at issue occurred in Kings County, New York.

9.       Venue is proper in this district under 28 U.S.C. § 1391(c) in that the City of New York is deemed to reside in this jurisdiction.

**FACTUAL ALLEGATIONS UNDERLYING PLAINTIFF'S CLAIMS**

10.   On August 10th, 2022, Plaintiff was standing against a gate at the exterior of the NYPD

transit district 30 (TD30) station house, in an unpaid fare zone section corridor that leads

to the Hoyt-Schermerhorn Street subway, recording photos and videos of TD30.

11.   Within minutes of Plaintiff making recordings, Plaintiff was approached by Individual

Defendants James Dhanpath; and Joleann A Brewstercolliar. Individual Defendant

Dhanpath gained Plaintiff's attention by shining a light at Plaintiff which reflected off of

the gate, and into the lens of Plaintiff's camera.

12.   In response to the light being directed at Plaintiff, Plaintiff turn to identify the source of

the light. Upon Plaintiff turning around, Individual Defendant Dhanpath briefly shown

the light into Plaintiff's face, and asked Plaintiff to explain the reason for  recording the

inside of TD30, and stated to Plaintiff that he worked there.

13.   Plaintiff demanded to be let alone; and Plaintiff used language to repel Individual

Defendant Dhanpath from further encroachment upon Plaintiff's First Amendment

protected activity.

14.   Immediately thereafter Plaintiff observed Individual Defendants David A Richter; and

William J Walton also standing close by. Plaintiff instructed Individual Defendants

Richter and Walton to intervene in the action being taken by Individual Defendant

Dhanpath.

15.   Individual Defendant Richter stated to Plaintiff "You're not gonna disrespect my

coworker like that." When Plaintiff asked Individual Defendant Richter what Individual

Defendant Richter was going to do about his perceived disrespect of Individual Defendant Dhanpath, Individual Defendant Richter stated "You gotta leave the station." Individual Defendant Richter continued, stating "You're not allowed to take pictures of the inside of the police station."

16. Individual Defendant Brewstercolliar joined Individual Defendant Richter in demanding that Plaintiff "leave the station." At which point Individual Defendants Richter and Walton physically seized Plaintiff, and forcibly moved Plaintiff to a stairwell.

17. During the physical assault on Plaintiff Individual Defendant Su Qu joined in the free-for-all styled ejection, and stated to Plaintiff "Get the fuck out" as he pulled and yanked on Plaintiff's arm to the point of causing injury to Plaintiff's right shoulder.

18. After being physically forced up the stairwell, Individual Defendants pushed Plaintiff to the sidewalk and told Plaintiff to leave; and refused to allow Plaintiff to go to TD30 to file a formal complaint for their assault and battery on Plaintiff.

19. Subsequently Lieutenant Christopher Sharp of TD30 had EMT's summoned to aid Plaintiff. Plaintiff was then taken to a hospital by ambulance for injuries sustained during the aforementioned force use by Individual Defendants.

20. As a result of the foregoing, Plaintiff sustained, *inter alia*, emotional distress; embarrassment; humiliation; bruising of the right arm; injury to the right shoulder; and deprivation of rights protected by the state and federal constitutions.

## A DEBT IS OWED TO PLAINTIFF

21. As a result of the actions taken without right or privilege by Individual Defendants,

Plaintiff generated an affidavit and bill of exchange with payment demand on August 23rd, 2022, [registration # RF 407 195 055 US] which was received by all Defendants between August 24th, 2022, and August 30th, 2022.

22.  Plaintiff's bill of exchange is an "instrument for the payment of money only" within the meaning of Article 32 of New York Civil Practice Law Rule § 3213; an unconditional order to pay; a payment demand; and a negotiable instrument within the meaning of UCC § 3-104 for which Plaintiff is entitled to payment.

23.  Plaintiff's payment demand was accepted for value received by all Defendants without protest or rebuttal. More than forty-five (45) days have passed since presentment of the payment demand; no payment has been made; and the payment demand has been retained by all Defendants without protest.

24.  All Defendants have had ample opportunity to object, or to protest the payment demand. All Defendants have proven unwilling to accept responsibility, and liability for their actions making all good faith attempts by Plaintiff to amicably settle this matter out of court unavailing.

## CCRB COMPLAINT AND THE RATIFICATION OF DEFENDANT CITY'S POLICY

25.  On August 13th, 2022, Plaintiff filed a complaint in regards to the August 10th, 2022 incident with Defendant City of New York through the City of New York Civilian Complaint Review Board ("CCRB").  [CCRB Case #: 202205365]

26.  The CCRB Board assigned case 202205365 to Investigator Adip Vora ("Vora"). On October 23rd, 2023. Vora found that Individual Defendants ejection, and use of force

against Plaintiff was outside of all governing rules; all applicable law, and forwarded his findings, with recommendations for discipline, to the CCRB Board.

27.    Vora's investigation revealed the following:

PO Richter's BWC footage from 01:12 captures Mr. Thomas tell PO Richter to tell this "foreign fuck" (referring to PO Dhanpath) to get away from him (Board Review 04). PO Richter tells Mr. Thomas twice to not disrespect his coworkers and Mr. Thomas responds both times that PO Richter is not going to do anything about it. PO Richter tells Mr. Thomas that he has to leave the station and repeats it multiple times, and Mr. Thomas tells PO Richter to kiss his ass and that he is not in the station. PO Brewstercolliar tells Mr. Thomas twice that he needs to leave the station and Mr. Thomas responds, "bitch, I'm not talking to you." PO Brewstercolliar again tells Mr. Thomas that he has to go. From 01:50, PO Richter grabs Mr. Thomas by his arm and pushes Mr. Thomas towards the exit of the subway station. PO Richter holds Mr. Thomas by his right arm and PO Walton puts his hand on Mr. Thomas' back. PO Richter pushes Mr. Thomas up the stairs and tells Mr. Thomas to walk up the stairs. Mr. Thomas stops on the stairs and turns around. PO Richter puts his hands on Mr. Thomas' back and pushes him up the stairs again. PO Qu comes up on Mr. Thomas' right, grabs his arm, and pulls him up the stairs. PO Qu pulls Mr. Thomas up to the first landing, then up to the street level, with the other officers following behind. PO Qu lets go of Mr. Thomas on the street level, before the exit to the station, and Mr. Thomas slows down. PO Richter pushes Mr. Thomas with two arms out of the subway station.

PO Dhanpath's BWC captures the entirety of the officers' interactions with Mr. Thomas (Board Review 03). At no point prior to his ejection does Mr. Thomas direct his attention towards individuals other than the officers, at no point do other civilians stop or gather, and at no point does any other civilian speak with any officer regarding Mr. Thomas' actions.

PO Richter testified that he approached Mr. Thomas because Mr.

Thomas was being disorderly in using racial slurs against and yelling at POs Dhanpath and Brewstercolliar (Board Review 13). PO Richter did not initially approach Mr. Thomas with the intention of ejecting him. Mr. Thomas continued to yell and use racial slurs against the officers after PO Richter approached him, so PO Richter made the determination to eject him for disorderly conduct. There was no other reason why PO Richter decided to eject Mr. Thomas. No other civilians became involved in Mr. Thomas' interaction with the officers. PO Richter asked Mr. Thomas to leave the subway station and Mr. Thomas refused to do so. PO Richter grabbed Mr. Thomas' wrist and Mr. Thomas tensed his arms and pushed PO Richter's arms away, so PO Richter pulled Mr. Thomas away from the stationhouse and pushed Mr. Thomas towards the exit. After PO Richter pushed Mr. Thomas, Mr. Thomas turned around, faced the officers, and stood there continuing to record. PO Richter again told Mr. Thomas that he needed to leave, then grabbed Mr. Thomas by the wrist and brought him to the stairs, where he stood a step or two behind Mr. Thomas and pushed him up the stairs. About halfway up the stairs, Mr. Thomas tensed and pushed PO Richter's arms away again, so PO Richter let go of Mr. Thomas so that he would not fall down the stairs. PO Qu then took over, grabbed Mr. Thomas, and pulled him up the stairs while PO Richter guided him forward from behind. Mr. Thomas did not move up the stairs of his own volition at any point, and once they got to the top of the stairs, Mr. Thomas did not leave the station and instead stood still and ignored verbal direction by the officers to leave. PO Richter pushed Mr. Thomas out of the street-level entrance to the subway station.

PO Qu's testimony was generally consistent with PO Richter's testimony (Board Review 15). While on the stairs, PO Qu grabbed Mr. Thomas' elbow to get him out of the station, as he was not willingly leaving. Mr. Thomas pulled away from PO Qu, and PO Qu grabbed him again and walked forward with his hand on Mr. Thomas' elbow. Mr. Thomas followed PO Qu out of the subway but did not move of his own accord and without guidance at any point.

PO Dhanpath's testimony was generally consistent with PO Richter's and PO Qu's testimony (Board Review 12). Mr. Thomas' problematic

behavior was limited to being loud, cursing at, and saying racial slurs towards the officers, and ignoring the officers' commands to leave the station. PO Dhanpath did not touch Mr. Thomas at any point during his ejection.

New York Codes, Rules, and Regulations Title 21 §1050.7 on Disorderly Conduct, states that no person on or in any facility or conveyance shall conduct themselves in any manner which may cause or tend to cause annoyance, alarm or inconvenience to a reasonable person or create a breach of the peace (Board Review 16).

In Matter of Armell N., 28 Misc. 3d 528, the Court opined that in 21 NYCRR §1050.7, "breach of the peace" is equated with "public inconvenience, annoyance, and alarm" and does not encompass annoying statements to police officers which create no actual risk of causing a public disturbance. A private annoyance to the officer, in the absence of testimony showing that there was a breach of the peace or that it attracted undue attention or caused consternation amongst anyone else, is insufficient to constitute disorderly conduct (Board Review 17).

Patrol Guide Procedures 221-01 and 221-02 govern the use of force by officers. In determining whether the use of force is reasonable, officers should consider the totality of the circumstances, including the nature of the circumstances, actions taken by the subject, and duration of the action. Officers must apply no more than the reasonable force necessary to gain control (Board Reviews 18-19)

28.   On  or about December 19, 2023, CCRB Panel 12C-2023 met, and voted to depart from the recommendations for discipline; and determined that the actions of Individual Defendants were **within policy** of Defendant City of New York. Specifically finding that the actions of Individual Defendants were "Within NYPD Guidelines" which CCRB defines to means the subject officer was found to have committed the act alleged, but the officer's actions were determined to be lawful. In the determination letter sent to Plaintiff

"Within NYPD Guidelines" states: **The allegation occurred but was not considered misconduct, and was permissible under the laws of New York or the rules set by the NYPD in their Patrol Guide.**

29.     In addition to Vora's findings on Individual Defendants use of force, Vora also revealed the following:

> PO Qu acknowledged that he told Mr. Thomas to "get the fuck out" (Board Review 15). PO Qu used profanity when speaking with Mr. Thomas because PO Qu was upset that Mr. Thomas was cursing and calling the officers names and racial slurs. There was no other reason why PO Qu cursed at Mr. Thomas.

> Patrol Guide Procedure 200-02 states that officers pledge to maintain a higher standard of integrity than is generally expected of others and render their services with courtesy and civility (Board Review 24).

> Per DAO Disciplinary Case Trial 2015-15012, officers may use profane language in dynamic situations in which they are still attempting to gain control (Board Review 25).

> It is undisputed that PO Qu told Mr. Thomas to "get the fuck out." PO Qu testified that his only reason for using profane language with Mr. Thomas was because he was upset that Mr. Thomas used vulgar language when speaking with the officers.

30.     The City of New York, through it's CCRB, made the following determination:

> The Panel believed that the MOS comments in question were "the language of the street," and that the stressful nature of the incident justified the use of the language. Therefore, the Panel voted to change the recommended disposition of Allegation L from "Substantiated" to "Within NYPD Guidelines".

### THE RIGHT TO RECORD POLICE IN NEW YORK

31.     In addition to the 1st Amendment to the Constitution of the United States, and Article 1,

        Section 8 (the "Free Press Clause") of the New York State Constitution; the New York

        State legislature enshrined into law the fundamental importance of the public's right to

        record law enforcement activity, with the enactment of the New Yorker's Right to

        Monitor Act, N.Y. Civil Rights Law § 79-P. Which states in part under Right to record

        law enforcement related activities. "A person not under arrest or in the custody of a law

        enforcement official has the right to record law enforcement activity and to maintain

        custody and control of that recording and of any property or instruments used by that

        person to record law enforcement activities…"

## A NYPD PATTERN AND PRACTICE

32.     The city of New York Police Department ("NYPD") has demonstrated a longstanding

        custom, pattern and practice of unlawfully interfering with the recording of police

        activity conducted in public view, a pattern revealed with clarity during the protests in

        New York City following the death of George Floyd in the summer of 2020 (the "George

        Floyd Protests").

33.     This custom, pattern and practice is the result of a lack of adequate training regarding the

        First Amendment right of the press and other individuals to record police activities in

        public, a failure to supervise and discipline officers who retaliate against or interfere with

        this right, and deliberate indifference by NYPD supervising personnel to a culture of

        disregard for the constitutional right to record police activity in public.

34.  The NYPD's widespread unconstitutional pattern and practice of obstructing and/or

preventing journalists and other individuals from filming police activity dates back

decades. In 1977, following a class action lawsuit filed by the New York Civil Liberties

Union ("NYCLU"), the NYPD entered into a consent decree with the NYCLU that

specifically acknowledged that individuals remain free to photograph police activity,

even in circumstances where the police are effecting an arrest, so long as the

photographer does not "directly endanger" an "officer or another person."

35.  Despite this consent decree, the NYPD has continued to routinely engage in the

unconstitutional practice of obstructing and retaliating against journalists. After a series

of incidents in the 1990s involving NYPD officers physically interfering with journalists'

attempts to report the news, the language from the 1977 consent decree regarding the

right to record police activity was incorporated verbatim into the 2000 NYPD patrol

guide. However, this change to the NYPD Patrol Guide has been cosmetic only, and the

NYPD's widespread practice of interfering with the right of journalists and other

individuals to record police activity has continued unabated.

36.  Between 2004 and 2022, Plaintiff has had several personal experiences with this type of

police abuse: In one such incident in February of 2014 Plaintiff was assaulted, resulting

in a bloodied and punctured lip, merely for photographing an arrest in a subway station

by P.O. Efrain Rojas of TD 32.

37.  That 2014 incident was eerily similar to this current incident on August 10th, 2022. The

difference being 5 cops as opposed to just one; here there was no arrest as in 2014; and in

2014 the incident actually originated in the transit system on a subway platform, whereas

in this current incident, Plaintiff wasn't actually in the subway system. But in both incidents, the police officers acted under color of law, but without any lawful authority to act.

38.  In that aforementioned 2014 incident the police officer was allowed to escape any criminal liability; and was allowed to continue his employment with the City of New York Police Department despite having committed several criminal acts.

39.  In February of 2014, Plaintiff was within the subway system after having passed through the turnstile; Plaintiff was standing on a subway platform recording police activity from approximately thirty feet away when a police officer approached Plaintiff because Plaintiff was recording police activity.

40.  That police officer and Plaintiff engaged in a verbal altercation which resulted in that police officer ejecting Plaintiff from the subway, and subsequently arresting Plaintiff.

41.  In that 2014 incident (CCRB Case Number: 20141583 02/15/2014) the Investigator found, and determined the following:

> PO Efrain Rojas ejected Shawn Thomas from the subway system. "It is undisputed that the decision to eject Mr. Thomas from the subway station was made by PO Rojas and that the actions which led to Mr. Thomas's ejection were solely in regards to his interaction with PO Rojas. Mr. Thomas was filming the issuance of a summons, from several feet away, when PO Rojas approached him. Mr. Thomas asked twice, "Could you please get out of my personal space?' PO Rojas responded, "You're invading my personal space." Mr. Thomas told PO Rojas that the officer approached him. PO Rojas, after Mr. Thomas's second request not to invade his personal space, stated, "You're invading my personal space, that is called OGA." PO Rojas offered to arrest Mr. Thomas.

After this interaction, Mr. Thomas told PO Rojas to "back the fuck up" and to get out of his personal space. PO Rojas responded that if Mr.Thomas had a right to film the officer, PO Rojas should be allowed to film him. At no point in the video does any other civilian interfere and at no point does the video depict a crowd forming. Mr. Johnson did not observe the incident until Mr. Thomas was already being ejected by PO. Rojas.

PO Dai did not hear the specifics of the interaction. He was never concerned for PO Rojas's safety and he did not look up from the summons that he was writing to see what the interaction was. He did not see a crowd form. PO Rojas stated that Mr. Thomas to PO Rojas to "get the fuck out of his face." PO Rojas asked Mr. Thomas to leave the station approximately three or four times. This statement was not corroborated by the video. He did this as Mr. Thomas's cursing was allegedly causing a crowd to form. He ejected Mr. Thomas for violating disorderly conduct, as Mr. Thomas had used profanity at him and caused a crowd to form.

MTA Rules 1050.9 ( c ) (encl. B2-3) An individual is permitted to film in the subway system, but are prohibited from using ancillary equipment such as lights, reflectors, or tripods.

MTA Rules 1050119 (encl. B32) An individual can be ejected from the transit system if the individual has violated the MTA rules of conduct.

People v. Baker 2013 N.Y. Lexi's 116 (encl. B16-20) The mere use of coarse language toward a police officer is not enough, alone, to constitute the public harm element required for disorderly conduct. An isolated exchange between a police officer and an individual, without any other aggressive action or extenuating circumstances, is not likely to constitute disorderly conduct. Likewise, the mere presence of spectators, without any indication that these spectators are likely to become involved in the dispute, is not enough to constitute disorderly conduct.

> Patrol Guide Procedure 208-03 (encl. B22-31) An individual who is in a public space observing an arrest or the issuance of a summons, even if that person is filming, using coarse language, and requesting names and shield numbers, unless the safety of officers or other persons is directly endangered, should not be arrested.The mere act of filming and using coarse language was not enough to constitute a violation of MTA rules or disorderly conduct.
>
> Mr. Thomas was not otherwise in violation of any of MTA's rules. Based on PO Dai's testimony and the video evidence, Mr. Thomas was not interfering with the issuance of the summons. PO Rojas, thus, was not justified in ejecting Mr. Thomas from the subway system.
>
> It is therefore recommended that Allegation C be substantiated."

42. Despite the criminal actions of PO Rojas in that 2014 incident which included the knowing filing of a false police report, Defendant City of New York gave him a slap on the wrist with the loss of nominal vacation days. However, PO Rojas was immediately issued a new badge number to shield him from being associated with that 2014 incident which was deemed "high profile" because of the media attention around that incident; and today PO Rojas doesn't appear on any published Brady List (Liar List).

43. As previously stated, members of the City of New York Police Department continued interference; harassment; assaults; and battery of individuals who exercise the First Amendment right to record and document matters of police activity has not abated.

44. It is well known that activist photojournalist commonly known as "First Amendment Auditors" (of which Plaintiff is the progenitor) are still suffering the unlawful  pattern and practice of the NYPD that is spoken of herein.

45. A pattern and practice that is on display for the world to see in YouTube videos on

channels such as "Long Island Audit" and  "Good Guy Activism" where there are videos as late as February 2024 depicting members of the City of New York Police Department interfering with photojournalist for simply standing on a sidewalk during daylight hours merely recording video of parked NYPD patrol cars.

## THE MATERIAL FACTS ARE NOT IN DISPUTE

46.     Plaintiff alleges that the facts are not in dispute, that the incident of August 10th, 2022, were captured on the body worn cameras ("BWC") of the Individual Defendants; and on two cameras carried by Plaintiff.

47.      Plaintiff alleges that Individual Defendants and Defendant City of New York have already conceded the actions taken by Individual Defendants consistent with Plaintiff's allegations.

48.     Plaintiff alleges that there is no controversy with respect to Individual Defendants actions, in that it is undisputed that Individual Defendants Dhanpath and Brewstercolliar contacted and took action against Plaintiff solely because Plaintiff was exercising a right protected by the first amendment to the constitution; and state law.

49.     Plaintiff alleges that Individual Defendants Richter; Walton; and Qu also contacted and took action against Plaintiff solely because Plaintiff was exercising a right protected by the first amendment to the constitution; and state law.

50.     Plaintiff also alleges that it cannot be disputed that the actions taken by Individual Defendants were taken without right or privilege; and that those actions were repugnant to the state constitution; the federal constitution; and all applicable law.

51.     Plaintiff alleges that it cannot be disputed that Defendant City authorized all actions that were taken without right or privilege by Individual Defendants against Plaintiff; and confirmed a policy which made those actions of Individual Defendants permissible.

52.     Plaintiff also alleges that as a matter of fact, and as a matter of law, that at all times Plaintiff was engaged in the exercise of Plaintiff's rights that are protected by the constitutions, and which were well established at the time of the violations on August 10th, 2022.

53.     Plaintiff alleges that Plaintiff was not suspected of being in violation of any law; statute; rule; or ordinance, and that, admittedly, the actions of Individual Defendants complained of herein were for the offense sometimes colloquially called "contempt of cop."

54.     Plaintiff also alleges that any pretext claim by Individual Defendants that Plaintiff committed an offense of " disorderly conduct" is contraindicated by the fact that Plaintiff was not arrested or issued a summons for any such violation.

55.     Plaintiff also alleges that as a result of the August 10th, 2022, attack on Plaintiff by Individual Defendants, and the failure of Defendant City to take any corrective action, but to instead deem such an attack to be within a policy of Defendant City, has had a chilling effect upon Plaintiff's exercise of rights protected by the First Amendment, such that Plaintiff has refrained from such activity, and fears resuming such activity in the future.

## AS AND FOR A FIRST CAUSE OF ACTION
## FIRST AMENDMENT RETALIATION

### 42 U.S.C. § 1983 and First and Fourteenth Amendments Against Individual Defendants

56.    Plaintiff repeats, reiterates and realleges each and every allegation contained in

paragraphs "1" through "55" with the same force and effect as if fully set forth herein.

57.    All of the aforementioned acts of Individual Defendants were carried out under the color

of State law. The actions taken against Plaintiff occurred because, or in retaliation for,

Plaintiff photographing police activity and/or in retaliation for Plaintiff's speech.

58.    By their conduct, as described herein, and acting under color of state law to deprive

Plaintiff of the right to freedom of speech and assembly under the First and Fourteenth

Amendments, Individual Defendants are liable for violations of 42 U.S.C. § 1983 which

prohibits the deprivations under color of state law of rights secured under the United

States Constitution.

59.    Individual Defendants have violated Plaintiff's rights to press and free speech; subjecting

Plaintiff to unlawful excessive force to deter the exercise of Plaintiff's rights

protected by the First Amendment; and interfering with and/or terminating

Plaintiff's lawful protected activities of observing, and documenting police

activity in a public forum; and speech deemed offensive or undesirable by

Defendant City and/or its agents and employees. Individual Defendants' actions

were taken in retaliation for Plaintiff's exercise of rights protected by the First

Amendment.

60.    The actions complained of herein were carried out by the aforementioned

Individual Defendants in their capacities as law enforcement officers, with he

entire actual and/or apparent authority attendant thereto.

61. The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers, pursuant to the customs, usages, practices, procedures, and the rules of the City of New York Police Department under the supervision of ranking officers of the department.

62. Individual Defendants, collectively and individually, while acting under color of state law, engaged in conduct that constituted a custom, usage, practice, procedure or rule of the respective municipality, which is forbidden by the New York State Constitution, and the Constitution of the United States.

63. As a direct and proximate result of Individual Defendants' unlawful actions, Plaintiff has suffered, and will continue to suffer damages including, physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.

64. As a result of the foregoing, Plaintiff has been damaged and demands compensatory and punitive damages.

**AS AND FOR A SECOND CAUSE OF ACTION**
**ASSAULT, BATTERY AND EXCESSIVE FORCE**

**42 U.S.C. § 1983 and Fourth and Fourteenth Amendments Against Individual Defendants**

65. Plaintiff repeats, reiterates and realleges each and every allegation contained in paragraphs numbered "1" through "64" with the same force and effect as if fully

set forth herein.

66.   By their conduct, as described herein, and acting under color of state law to

deprive Plaintiff of the right to be free from assault; battery; excessive force, and

unreasonable seizures as required by the Fourth, and Fourteenth Amendments,

which prohibits the deprivation under color of state law of rights secured under the

United States Constitution.

67.   Acting under color of state law, Individual Defendants assaulted and battered

Plaintiff without justification or excuse therefor.

68.   Acting under color of state law, Individual Defendants aided and abetted in the

assault and battery of Plaintiff without justification or excuse therefor.

69.   Acting under color of state law, Individual Defendants used force in excess of that

justified by law.

70.   As a direct and proximate result of Individual Defendants' unlawful actions,

plaintiff has suffered, and will continue to suffer damages including, physical,

mental and emotional injury and pain, mental anguish, suffering, humiliation and

embarrassment.

71.   As a result of the foregoing, Plaintiff has been damaged and demands compensatory and

punitive damages.

### AS AND FOR A THIRD CAUSE OF ACTION
### MUNICIPAL AND SUPERVISORY LIABILITY

### 42 U.S.C. § 1983 Monell Claim against Defendant City

72.     Plaintiff repeats, reiterates, and realleges each and every allegation contained in

paragraphs number "1" through "71" with the same force and effect as if fully set forth

herein.

73.     At all relevant times herein, Defendant City, acting through its POLICE

DEPARTMENT, developed, implemented, enforced, encouraged and sanctioned de facto

policies, practices, and/or customs exhibiting deliberate indifference to Plaintiff's rights

protected by the constitutions, which caused the violations of such rights.

74.     Individual Defendants' (DHANPATH, BREWSTERCOLLIAR, RICHTER, WALTON,

and QU) unlawful actions were done willfully and with the specific intent to deprive

Plaintiff of rights protected under the First, Fourth, and Fourteenth Amendments to the

U.S. Constitution.

75.     The constitutional abuses and violations by Defendant City, through the actions of its

police department and Individual Defendants (DHANPATH, BREWSTERCOLLIAR,

RICHTER, WALTON, and QU) were and are directly and proximately caused by

policies, practices and/or customs that developed the failure: (a) to adequately supervise

and train its officers and agents, including the above-named defendants, thereby failing

to adequately discourage further constitutional violations on the part of its police

officers; (b) to properly and adequately monitor and discipline its officers, including the

above-named defendants; and (c) to adequately and properly investigate complaints of

police misconduct, and, instead, acts of misconduct were tolerated by Defendant City.

76.     Upon information and belief, Defendant City has, acting through its POLICE

DEPARTMENT, developed, implemented, enforced, encouraged, and sanctioned a de

facto policy, practice, and/or custom of unlawfully interfering with individuals who exercise their rights under the First Amendment by engaging in, *inter alia*, monitoring and documenting police activities and/or misconduct.

77. Individual Defendants' unlawful actions were done willfully, knowingly and with specific intent to deprive Plaintiff of rights protected under the First, Fourth and Fourteenth Amendments to the U.S. Constitution.

78. Individual Defendants have acted with deliberate indifference to the rights of Plaintiff which are protected by the constitution. As a direct and proximate result of the acts as stated herein by each of the defendants, the Plaintiff's protected rights have been violated which has caused Plaintiff to suffer physical, mental and emotional injury and pain, mental anguish, suffering, humiliation and embarrassment.   .

79. The violations of Plaintiff's protected rights, and of Federal Law, as herein above enumerated against the Individual Defendants, and each of them, were carried out under the following policies, customs, and practices of Defendant City.

A. A policy, custom and practice to harass, and/or interfere with individuals exercising rights protected by the First Amendment despite lack of probable cause of a crime, but based instead on the non criminal act of "contempt of cop" ;

B. A policy, custom and practice to harass, seize and/or interfere with individuals despite lack of probable cause of a crime, based instead on the perception of police officers that a person is asserting their right to be free from police misconduct, or has asserted such rights in the past;

C. A policy, custom and practice to harass, use excessive force against and/or interfere

with individuals who engage in acts of "contempt of cop" and/or publicizing information derogatory to the City of New York Police Department and/or to individual City of New York Police Officers, in the absence of criminal violations;

D.  A failure to train officers to comply with the requirements of the law as set forth above, exhibiting deliberate indifference to the rights of individuals with whom police officers come in contact, as shown by Defendant City's awareness of data demonstrating that said policies, customs and practices resulted in routine violations of law and rights protected by constitution.

80.   Defendant City is liable for the damages suffered by Plaintiff as a result of the conduct of their employees, agents, and servants, in that they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or customs to continue, as detailed within this claim and complaint.

81.   Defendant City and its employees, agents and servants have been reckless, grossly negligent and/or negligent in training and managing subordinates who caused the unlawful events suffered by Plaintiff, as detailed within this claim and complaint.

82.   Defendant City has been alerted to the use of excessive force, and interference of individuals exercising rights protected by the First Amendment by its police officers but has nevertheless exhibited deliberate indifference to such excessive force and interference.

83.   The City has failed to train its police officers properly with regard to proper use of force during interactions with activist; journalists; and when confronted with perceived "contempt of cop."

84.   The deliberate indifference of Defendant City; its employees; agents; and servants, caused the violation of Plaintiff's rights protected by the constitution in this case.

85.   Defendant City, and its employees, agents and servants, know to a moral certainty that the employees of the City of New York Police Department confront the situations referenced in this claim and complaint on a relatively frequent basis. Nevertheless, Defendant City has allowed policies, practices and customs that allow the aforementioned to persist.

86.   For example, the well documented failures of the CCRB to substantiate obviously meritorious complaints has gone uncorrected. The CCRB regularly finds complainants lack credibility based on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating serious charges brought to them.

87.   In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; as a result, officers have no real incentive to come forward, or to testify truthfully at the CCRB.

88.   Furthermore, in the extraordinarily rare event that the CCRB substantiates a complaint and the Department Advocate proves the case in an internal trial against an officer, the police commissioner still maintains the power to reduce the discipline against such an officer.

89.   Further, the City has no procedure to notify individual officers or their supervisors of

unfavorable judicial review of their conduct. Without this notification, improper

behaviors; misconduct; use of excessive force; and the  use of non-credible testimony go

uncorrected.

90.     Additionally, according to a report of the New York City Bar Association issued in 2000,

the City has isolated their law department from the discipline of police officers, so that

civil actions against police officers for actions taken in their capacity as police officers

have no impact on the officers' careers, regardless of the outcome of the civil actions.

91.     In 1999, the New York City Comptroller reported that there was a "a total disconnect"

between the settlements of substantial civil claims and police department action against

officers.

92.     The City is aware that all of the aforementioned has resulted in violations of

constitutional rights.

93.     Despite such notice, Defendant City has failed to take corrective action and/or to provide

proper training to its officers.

94.     Defendant City has acted with deliberate indifference with regard to the above actions

and omissions.

95.     This failure to act, failure to train, deliberate indifference, and these policies, practices

and customs caused the officers in the present case to violate Plaintiff's rights, without

fear of reprisal.

96.     Plaintiff has been damaged as a result of the deliberate indifference of the City to the

constitutional rights of New Yorkers, including Plaintiff.

97.     Under 42 U.S.C. § 1983, Defendant City is jointly and severally liable with Individual

Defendants and each of them for the general and specific damages Plaintiff sustained, as well as the costs and disbursements of the action.

### AS AND FOR A FOURTH CAUSE OF ACTION
### UNLAWFUL INTERFERENCE WITH RECORDING

**N.Y. Civ. Rights Law § 79-P New York State Right To Monitor Act**
**against Defendants Dhanpath; Brewstercolliar; and Richter**

98.   Plaintiff repeats, reiterates, and realleges each and every allegation contained in paragraphs number "1" through "97" with the same force and effect as if fully set forth herein.

99.   Plaintiff alleges that Plaintiff was in fact exercising the right established and protected in subdivision two of New York Civil Rights Law § 79-P to record a law enforcement activity and that Defendants Dhanpath; Brewstercolliar; and Richter acted to interfere with Plaintiff's recording of a law enforcement activity by intentionally preventing or attempting to prevent Plaintiff from recording law enforcement activity.

100.  Pursuant to this section of State Law known as The Right To Monitor Act, "A person subject to unlawful interference with recording law enforcement activities as described in paragraph (a) of this subdivision may bring an action for any violation of this section in any court of competent jurisdiction for damages, including punitive damages, for declaratory and injunctive relief, and such other remedies as the court may deem appropriate."

101.  The Right To Monitor Act also establishes a "preservation of rights" which states "This section shall be in addition to all rights, procedures, and remedies available under the

United States Constitution, 42 USC 1983, the constitution of the state of New York and

all other federal law, state law, law of the city of New York or the administrative code of

the city of New York, and all other civil remedies, including monetary damages, created

by statute, ordinance, regulation or common law."

102.    As a direct and proximate result of Defendant Dhanpath; Brewstercolliar; and

Richter unlawful actions, Plaintiff has suffered, and will continue to suffer

damages including, physical, mental and emotional injury and pain, mental

anguish, suffering, humiliation and embarrassment.

103.    As a result of the foregoing, Plaintiff has been damaged and demands compensatory

damages as demanded in Plaintiff's Bill of Exchange, and accounting statement, and

punitive damages to be determined by a jury.

**WHEREFORE**, Plaintiff demands judgment and prays for the following relief,

jointly and severally, against all Defendants:

A.      A declaration that Individual Defendants' conduct violated Plaintiff's rights that

are protected by the First, Fourth, and Fourteenth Amendments of the U.S. Constitution;

B.      An injunction enjoining defendants from engaging in conduct to unlawfully

disrupt, disperse, interfere with or prevent the lawful First Amendment activities explained of

herein;

C.      Full compensation in the amount for fees owed to Plaintiff for value received;

D.      Punitive damages in an amount to be determined by a jury;

E.      Costs and disbursements; and,

F.      Such other and further relief as appears just and proper.

Pursuant to 28 U.S. Code § 1746, I declare under penalty of perjury under the laws of the united

states of America that the foregoing is true and correct.


Dated:   Kings County, New York
         June 25th, 2024



**Shawn Randall Thomas,** Sui Juris
**c/o A.M.R.**
**309 Lafayette Avenue, Suite 21G**
**Kings County New York [11238]**
**srandallthomas@email.com**
**917-727-9194**

**Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my

knowledge, information, and belief that this complaint: (1) is not being presented for an improper

purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) is supported by existing law or by a non-frivolous argument for extending, modifying, or

reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so

identified, will likely have evidentiary support

after a reasonable opportunity for further investigation or discovery; and (4) the complaint

otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case- related

papers may be served. I understand that my failure to keep a current address on file with

the Clerk's Office may result in the dismissal of my case.

Date of signing: June 25th, 2024.

Signature of Plaintiff _____

Printed Name of Plaintiff  Shawn Randall Thomas _____